Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Liaison Counsel for Plaintiff*

[additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANGHYEP HAN, derivatively on behalf of NVIDIA CORP., <br><br> Plaintiff, <br><br> v. <br><br> JEN-HSUN HUANG, COLETTE M. KRESS, ROBERT K. BURGESS, TENCH COXE, PERSIS S. DRELL, JAMES A. GAITHER, DAWN HUDSON, HARVEY C. JONES, MICHAEL G. MCCAFFERY, MARK L. PERRY, A. BROOKE SEAWELL, and MARK A. STEVENS, <br><br> Defendants, <br><br> and <br><br> NVIDIA CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### INTRODUCTION

Plaintiff Sanghyep Han ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant NVIDIA Corporation ("NVIDIA" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jen-Hsun Huang, Colette M. Kress, Robert K. Burgess, Tench Coxe, Persis S. Drell, James C. Gaither, Dawn Hudson, Harvey C. Jones, Michael G. McCaffery, Mark L. Perry, A. Brooke Seawell, and Mark A. Stevens (collectively, the "Individual Defendants," and together with NVIDIA, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of NVIDIA, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NVIDIA, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by NVIDIA's directors and officers from August 10, 2017 through the present (the "Relevant Period").

2.      NVIDIA is a technology company specializing in the research, development, and design of graphic processing units ("GPUs") and other related software.

3.      NVIDIA's products are widely marketed to various industries. The Company's GPUs however, target specialized markets including gamers, designers, artificial intelligence scientists and researchers, and cloud-based visual computing users.  The Company also provides specific GPUs to the cryptocurrency market for cryptocurrency mining ("cryptomining").

4. During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements indicating that the Company could withstand the volatility of the cryptocurrency market, specifically through their computer gaming customer demand, and effectively navigate the cryptocurrency market.

5. The Individual Defendants further made and/or caused the Company to make false and misleading statements that the Company was more than capable of successfully managing its inventory channel and that its focus and growth were connected little if at all to customers purchasing its GPUs for cryptocurrency related purposes, in effect downplaying any significance it could have on the record revenues the Company was reporting.

6. In response to the false and misleading statements disseminated during the Relevant Period, NVIDIA's stock prices soared and were trading at record highs. Meanwhile, the Individual Defendants were selling large quantities of their shares at artificially inflated prices, collecting millions of dollars in proceeds.

7. On November 15, 2018, NVIDIA revealed in a press release, also filed by the Company in a current report on Form 8-K with the SEC that same day, that it expected its revenue to drop to $2.70 billion for the fourth fiscal quarter ending January 27, 2019. This was markedly different from the growth that the Individual Defendants led investors to expect from the Company during the Relevant Period. NVIDIA attributed the poor financial results to an oversupply of midrange GPUs that had built up before the rapid decline in the demand for GPUs for cryptocurrency mining.

8. On this news, the price per share of NVIDIA stock dropped 29% over the next two trading sessions. The share price dropped almost 19%, or $37.96, from the previous trading day's closing price, closing at $164.43 on November 16, 2018.  The price of the Company's shares continued to drop over the next trading session, losing over 11% of their value, or $19.73, by the end of the next trading day, closing at $144.70 on November 19, 2018.

9. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects.

Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11. Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while ten of them engaged in insider sales, netting proceeds of over $147.2 million. Approximately 4.8 million shares of the Company's common stock were repurchased at inflated prices between August 28, 2017 and October 28, 2018 for over $1.1 billion. As the Company's stock was actually only worth $144.70 per share, the price at which it was trading on November 19, 2018, the Company overpaid approximately $404.3 million in total.

12. In light of the Individual Defendants' misconduct, which has subjected NVIDIA, its President and Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO"), to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the

Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of NVIDIA's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the

Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20. Venue is proper in this District because NVIDIA and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

21. Plaintiff is a current shareholder of NVIDIA common stock. Plaintiff has continuously held NVIDIA common stock at all relevant times.

**Nominal Defendant NVIDIA**

22. NVIDIA is a Delaware corporation with its principal executive offices at 2788 San Tomas Expressway, Santa Clara, CA, 95051. NVIDIA's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "NVDA."

**Defendant Huang**

23. Defendant Jen-Hsun Huang ("Huang") co-founded NVIDIA and has served as the Company's President and CEO, and as a Company director, since 1993. According to the Company's Schedule 14A filed with the SEC on April 6, 2018 (the "2018 Proxy Statement"), as of January 28, 2018, Defendant Huang beneficially owned 21,401,650 shares of the Company's common stock, which represented 3.87% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018[1] was $243.33, Huang owned approximately $5.2 billion worth of NVIDIA stock.

24. For the fiscal year ended January 28, 2018, Defendant Huang received $12,993,532 in compensation from the Company. This included $999,985 in salary, $9,787,985 in stock awards, $2,200,000 in non-equity incentive plan compensation, and $5,562 in all other compensation.

25. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Huang made the following sale of company stock, and made no purchases of Company stock:

---

[1] This date represents the closing price of the Company's stock on the last day of trading prior to Jan 28, 2018.

Verified Shareholder Derivative Complaint

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 6, 2017 | 110,000 | $ 166.08 | $ 18,268,800 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

26.     The Company's 2018 Proxy Statement stated the following about Defendant Huang:

Jen-Hsun Huang co-founded NVIDIA in 1993 and has since served as president, chief executive officer, and a member of the board of directors. Mr. Huang held a variety of positions from 1985 to 1993 at LSI Logic Corp., a computer chip manufacturer, including leading the business unit responsible for the company's system-on-a-chip strategy. He was a microprocessor designer from 1984 to 1985 at Advanced Micro Devices, Inc., a semiconductor company. Mr. Huang holds a BSEE degree from Oregon State University and an MSEE degree from Stanford University.

*Mr. Huang is one of the technology industry's most respected executives, having taken NVIDIA from a startup to a world leader in visual computing. Under his guidance, NVIDIA has compiled a record of consistent innovation and sharp execution, marked by products that have gained strong market share.*[2]

**Defendant Kress**

27.     Defendant Colette M. Kress ("Kress") has served as NVIDIA's executive Vice President and CFO since September 2013. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Kress beneficially owned 138,214 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Kress owned approximately $33.6 million worth of NVIDIA stock.

28.     For the fiscal year ended January 28, 2018, Defendant Kress received $4,833,715 in compensation from the Company. This included $899,120 in salary, $3,327,973 in stock awards, $600,000 in non-equity incentive plan compensation, and $6,622 in all other compensation.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kress made the following sales of Company stock, and made no purchases of Company stock:

---

[2] Emphasis in original unless otherwise noted in this Complaint.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 9, 2017 | 22,808 | $ 185.31 | $ 4,226,550 |
| December 14, 2017 | 171 | $ 185.57 | $ 31,732 |
| June 21, 2018 | 889 | $ 257.64 | $ 229,041 |
| September 20, 2018 | 11,576 | $ 266.31 | $ 3,082,804 |

Thus, in total, before the fraud was exposed, she sold 35,444 Company shares on inside information, for which she received approximately $7.6 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

30.     The Company's website states the following about Defendant Kress:[3]

Colette Kress is executive vice president and chief financial officer of NVIDIA. She joined the company in September 2013, after serving nearly 25 years in a range of finance roles at major technology companies.

She previously served for three years as senior vice president and chief financial officer at Cisco's Business Technology and Operations Finance organization, where she was responsible for financial strategy, planning, reporting and business development for all business segments, engineering and operations.

Previously, she spent 13 years at Microsoft, including four years as chief financial officer of the Server and Tools division, and held senior roles in corporate planning and finance. Prior to that, she served at Texas Instruments in a variety of finance positions.
Kress holds a B.Sc. degree in finance from University of Arizona and an MBA from Southern Methodist University.

**Defendant Burgess**

31.     Defendant Robert K. Burgess ("Burgess") has served as a Company director since 2011. He also serves as Chair of the Compensation Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Burgess beneficially owned 70,472 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Burgess owned approximately $17.1 million worth of NVIDIA stock.

32.     For the fiscal year ended January 28, 2018, Defendant Burgess received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

---

[3] https://nvidianews.nvidia.com/bios/colette-kress. Last visited Jan. 09, 2019.

33.     The Company's 2018 Proxy Statement stated the following about Defendant Burgess:

Robert K. Burgess has served as an independent investor and board member to technology companies since 2005. He was chief executive officer from 1996 to 2005 of Macromedia, Inc., a provider of internet and multimedia software, which was acquired by Adobe Systems Incorporated; he also served from 1996 to 2005 on its board of directors, as chairman of its board of directors from 1998 to 2005 and as executive chairman for his final year. Previously, he held key executive positions from 1984 to 1991 at Silicon Graphics, Inc. (SGI), a graphics and computing company; from 1991 to 1995, served as chief executive officer and a board member of Alias Research, Inc., a publicly traded 3D software company, until its acquisition by SGI; and resumed executive positions at SGI during 1996. Mr. Burgess serves on the board of Adobe and Rogers Communications Inc., a communications and media company, and has served on the boards of several privately-held companies. He was a director of IMRIS Inc., a provider of image guided therapy solutions, from 2010 until 2013. He holds a BCom degree from McMaster University.

*Mr. Burgess brings to the Board senior management and operating experience and expertise in the areas of financial- and risk-management. He has a broad understanding of the roles and responsibilities of a corporate board and provides valuable insight on a range of issues in the technology industry.*

**Defendant Coxe**

34.     Defendant Tench Coxe ("Coxe") has served as a Company director since 1993. He also serves as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Coxe beneficially owned 1,263,975 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Coxe owned approximately $307.6 million worth of NVIDIA stock.

35.     For the fiscal year ended January 28, 2018, Defendant Coxe received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Coxe made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 18, 2017 | 50,000 | $  189.62 | $  9,481,000 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

37.     The Company's 2018 Proxy Statement stated the following about Defendant Coxe:

Tench Coxe has been a managing director of Sutter Hill Ventures, a venture capital investment firm, since 1989, where he focuses on investments in the IT sector. Prior to joining Sutter Hill Ventures in 1987, he was director of marketing and MIS at Digital Communication Associates. He serves on the board of directors of Mattersight Corp., a customer loyalty software firm, Artisan Partners Asset Management Inc., an institutional money management firm, and several privately held technology companies. Mr. Coxe holds a BA degree in Economics from Dartmouth College and an MBA degree from Harvard Business School.

*Mr. Coxe brings to the Board expertise in financial and transactional analysis and provides valuable perspectives on corporate strategy and emerging technology trends. His significant financial community experience gives the Board an understanding of the methods by which companies can increase value for their stockholders.*

**Defendant Drell**

38.     Defendant Persis S. Drell ("Drell") has served as a Company director since 2015. She also serves as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Drell beneficially owned 14,419 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Drell owned approximately $3.5 million worth of NVIDIA stock.

39.     For the fiscal year ended January 28, 2018, Defendant Drell received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Drell made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 20, 2017 | 606 | $ 197.07 | $ 119,424 |
| March 28, 2018 | 5,141 | $ 220.73 | $ 1,134,772 |

Thus, in total, before the fraud was exposed, she sold 5,747 Company shares on inside information, for which she received approximately $1.3 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

The Company's 2018 Proxy Statement stated the following about Defendant Drell:

Persis S. Drell has been the Provost of Stanford University since 2017. A Professor of Materials Science and Engineering and Professor of Physics, Dr. Drell has been on the faculty at Stanford since 2002, and was the Dean of the Stanford School of Engineering from 2014 to 2017. She served as the Director of the U.S. Department of Energy SLAC National Accelerator Laboratory from 2007 to 2012. Dr. Drell is a member of the National Academy of Sciences and the American Academy of Arts and Sciences, and is a fellow of the American Physical Society. She has been the recipient of a Guggenheim Fellowship and a National Science Foundation Presidential Young Investigator Award. Dr. Drell holds a Ph.D. from the University of California Berkeley and an AB degree in Mathematics and Physics from Wellesley College.

*An accomplished researcher and educator, Dr. Drell brings to the Board expert leadership in guiding innovation in science and technology.*

**Defendant Gaither**

41.     Defendant James C. Gaither ("Gaither") has served as a Company director since 1998. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Gaither beneficially owned 200,970 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Gaither owned approximately $48.9 million worth of NVIDIA stock.

42.     For the fiscal year ended January 28, 2018, Defendant Gaither received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gaither made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|-----------------|-------|----------|
| February 15, 2018 | 40,359 | $   245.67 | $   9,914,995 |
| May 31, 2018 | 45,000 | $   253.59 | $   11,411,550 |

Thus, in total, before the fraud was exposed, he sold 85,359 Company shares on inside information, for which he received approximately $21.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2018 Proxy Statement stated the following about Defendant Gaither:

James C. Gaither has been a partner of Sutter Hill Ventures, a venture capital investment firm, since 2000. He was a partner in the law firm Cooley LLP from 1971 to 2000 and senior counsel to the firm from 2000 to 2003. Prior to practicing law, he served as a law clerk to The Honorable Earl Warren, Chief Justice of the United States Supreme Court, special assistant to the Assistant Attorney General in the U.S. Department of Justice and staff assistant to U.S. President Lyndon Johnson. Mr. Gaither is a former president of the Board of Trustees at Stanford University, former vice chairman of the board of directors of The William and Flora Hewlett Foundation and past chairman of the Board of Trustees of the Carnegie Endowment for International Peace. Mr. Gaither holds a BA degree in Economics from Princeton University and a JD degree from Stanford University Law School.

*Mr. Gaither brings to the Board expertise in corporate strategy and negotiating complex transactions. He also provides valuable perspectives on the roles and responsibilities of a corporate board, including oversight of a public company's legal and regulatory compliance and engagement with regulatory authorities. His significant financial community experience gives the Board an understanding of the methods by which companies can increase value for their stockholders.*

**Defendant Hudson**

45.     Defendant Dawn Hudson has served as a Company director since 2013. She also serves as a member of the Audit Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Hudson beneficially owned 93,229 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was

$243.33, Hudson owned approximately $22.7 million worth of NVIDIA stock.

46.     For the fiscal year ended January 28, 2018, Defendant Hudson received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

47.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hudson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| November 13, 2017 | 15,000 | $   213.44 | $     3,201,600 |
| November 22, 2017 | 3,052 | $   214.39 | $       654,318 |

Thus, in total, before the fraud was exposed, she sold 18,052 Company shares on inside information, for which she received approximately $3.9 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Hudson:

Dawn Hudson has served as Chief Marketing Officer for the National Football League since 2014. She announced in March 2018 her intention to step down from the role effective April 2018. Ms. Hudson served from 2009 to 2014 as vice chairman of The Parthenon Group, an advisory firm focused on strategy consulting. She was president and chief executive officer of Pepsi-Cola North America, the beverage division of PepsiCo, Inc. for the U.S. and Canada, from 2005 to 2007 and president from 2002, and simultaneously served as chief executive officer of the foodservice division of PepsiCo, Inc. from 2005 to 2007. Previously, she spent 13 years in marketing, advertising and branding strategy, holding leadership positions at major agencies, such as D'Arcy Masius Benton & Bowles and Omnicom. Ms. Hudson currently serves on the board of directors of The Interpublic Group of Companies, Inc., an advertising holding company. She was a director of P.F. Chang's China Bistro, Inc., a restaurant chain, from 2010 until 2012, of Allergan, Inc., a biopharmaceutical company, from 2008 until 2014, of Lowes Companies, Inc., a home improvement retailer, from 2001 until 2015, and of Amplify Snack Brands, Inc., a snack food company, from 2014 until 2018. She holds a BA degree in English from Dartmouth College.

*Ms. Hudson brings to the board experience in executive leadership. As a longtime*

*marketing executive, she has valuable expertise and insights in leveraging brands, brand development and consumer behavior. She also has considerable corporate governance experience, gained from more than 10 years of serving on the boards of public companies.*

**Defendant Jones**

49.     Defendant Harvey C. Jones ("Jones") has served as a Company director since 1993. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Jones beneficially owned 455,674 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Jones owned approximately $110.9 million worth of NVIDIA stock.

50.     For the fiscal year ended January 28, 2018, Defendant Jones received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

51.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Jones made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 21, 2017 | 100,000 | $    185.65 | $    18,565,000 |
| June 26, 2018 | 100,000 | $    242.11 | $    24,211,000 |

Thus, in total, before the fraud was exposed, he sold 200,000 Company shares on inside information, for which he received approximately $42.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Jones:

Harvey C. Jones has been the managing partner of Square Wave Ventures, a private investment firm, since 2004. Mr. Jones has been an entrepreneur, high technology executive and active venture investor for over 30 years. In 1981, he co-founded Daisy Systems Corp., a computer-aided engineering company, ultimately serving as its president and chief executive officer until 1987. Between 1987 and 1998, he led

Synopsys. Inc., a major electronic design automation company, serving as its chief executive officer for seven years and then as executive chairman. In 1997, Mr. Jones co-founded Tensilica Inc., a privately held technology IP company that developed and licensed high performance embedded processing cores. He served as chairman of the Tensilica board of directors from inception through its 2013 acquisition by Cadence Design Systems, Inc. In 2016, Mr. Jones joined the board of directors of and invested in TempoQuest, a private company seeking to develop advanced weather forecasting systems that exploit accelerated GPU technology. He was a director of Tintri Inc., a company that builds data storage solutions for virtual and cloud environments, from 2014 until March 2018. Mr. Jones holds a BS degree in Mathematics and Computer Sciences from Georgetown University and an MS degree in Management from Massachusetts Institute of Technology.

*Mr. Jones brings to the board an executive management background, an understanding of semiconductor technologies and complex system design. He provides valuable insight into innovation strategies, research and development efforts, as well as management and development of our technical employees. His significant financial community experience gives the Board an understanding of the methods by which companies can increase value for their stockholders.*

**Defendant McCaffery**

53.     Defendant Michael G. McCaffery ("McCaffery") has served as a Company director since 2015. He also serves as Chair of the Audit Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant McCaffery beneficially owned 18,857 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, McCaffery owned approximately $4.6 million worth of NVIDIA stock.

54.     For the fiscal year ended January 28, 2018, Defendant McCaffery received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant McCaffery:

Michael G. McCaffery is the Chairman and a Managing Director of Makena Capital Management, an investment management firm. From 2005 to 2013, he was the Chief Executive Officer of Makena Capital Management. From 2000 to 2006, he was the President and Chief Executive Officer of the Stanford Management Company, the university subsidiary charged with managing Stanford University's financial and real estate investments. Prior to Stanford Management Company, Mr. McCaffery was President and Chief Executive Officer of Robertson Stephens and Company, a San Francisco-based investment bank and investment management firm, from 1993 to 2009, and also served as Chairman in 2000. Mr. McCaffery serves on the board of directors, or on the advisory boards, of several privately held companies and non-profits. He was a

director of KB Home, a homebuilding company, from 2003 until 2015. Mr. McCaffery is a Trustee of the Rhodes Scholarship Trust. He holds a BA degree from the Woodrow Wilson School of Public and International Affairs at Princeton University, a BA Honours degree and an MA degree in Politics, Philosophy and Economics from Merton College, Oxford University, Oxford, England, and an MBA degree from the Stanford Graduate School of Business.

*Mr. McCaffery brings to the Board a broad array of business, investment and real estate experience and recognized expertise in financial matters, as well as a demonstrated commitment to good corporate governance.*

**Defendant Perry**

56.     Defendant Mark L. Perry ("Perry") has served as a Company director since 2005. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Perry beneficially owned 87,040 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Perry owned approximately $21.2 million worth of NVIDIA stock.

57.     For the fiscal year ended January 28, 2018, Defendant Perry received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

58.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Perry made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 14, 2017 | 16,281 | $      162.24 | $      2,641,429 |
| February 12, 2018 | 17,307 | $      227.93 | $      3,944,784 |

Thus, in total, before the fraud was exposed, he sold 33,588 Company shares on inside information, for which he received approximately $6.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

59.     The Company's 2018 Proxy Statement stated the following about Defendant Perry:

Mark L. Perry serves on the boards of, and consults for, various companies and non-profit organizations. From 2012 to 2013, Mr. Perry served as an Entrepreneur-in-Residence at Third Rock Ventures, a venture capital firm. He served from 2007 to 2011 as president and chief executive officer of Aerovance, Inc., a biopharmaceutical company. He was an executive officer from 1994 to 2004 at Gilead Sciences, Inc., a biopharmaceutical company, serving in a variety of capacities, including general counsel, chief financial officer, and executive vice president of operations, responsible for worldwide sales and marketing, legal, manufacturing and facilities; he was also its senior business advisor until 2007. From 1981 to 1994, Mr. Perry was with the law firm Cooley LLP, where he was a partner for seven years. He serves on the board of directors and as lead independent director of Global Blood Therapeutics, Inc. and on the board of directors and as chairman of MyoKardia, Inc., both biopharmaceutical companies. Mr. Perry holds a BA degree in History from the University of California, Berkeley, and a JD degree from the University of California, Davis.

*Mr. Perry brings to the Board operating and finance experience gained in a large corporate setting. He has varied experience in legal affairs and corporate governance, and a deep understanding of the roles and responsibilities of a corporate board.*

**Defendant Seawell**

60.    Defendant A. Brooke Seawell ("Seawell") has served as a Company director since 1997. He also serves as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Seawell beneficially owned 200,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Seawell owned approximately $48.7 million worth of NVIDIA stock.

61.    For the fiscal year ended January 28, 2018, Defendant Seawell received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

62.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seawell made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 1, 2017 | 30,000 | $ 170.19 | $ 5,105,700 |
| November 20, 2017 | 1,029 | $ 214.10 | $ 220,308 |
| June 4, 2018 | 20,000 | $ 264.64 | $ 5,292,800 |
| June 5, 2018 | 1,029 | $ 264.85 | $ 272,530 |

Thus, in total, before the fraud was exposed, he sold 52,058 Company shares on inside information, for which he received approximately $10.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

63.     The Company's 2018 Proxy Statement stated the following about Defendant Seawell:

A. Brooke Seawell has served since 2005 as a venture partner at New Enterprise Associates, and was a partner from 2000 to 2005 at Technology Crossover Ventures. He was executive vice president from 1997 to 1998 at NetDynamics, Inc., an application server software company, which was acquired by Sun Microsystems, Inc. He was senior vice president and chief financial officer from 1991 to 1997 of Synopsys, Inc., an electronic design automation software company. He serves on the board of directors of Tableau Software, Inc., a business intelligence software company, and several privately held companies. Mr. Seawell served on the board of directors of Glu Mobile, Inc., a publisher of mobile games, from 2006 to 2014, and of Informatica Corp., a data integration software company, from 1997 to 2015. He also previously served as a member of the Stanford University Athletic Board and on the Management Board of the Stanford Graduate School of Business. Mr. Seawell holds a BA degree in Economics and an MBA degree in Finance from Stanford University.

*Mr. Seawell brings to the Board operational expertise and senior management experience, including knowledge of the complex issues facing public companies, and a deep understanding of accounting principles and financial reporting. His significant financial community experience gives the Board an understanding of the methods by which companies can increase value for their stockholders.*

**Defendant Stevens**

64.     Defendant Mark A. Stevens ("Stevens") has served as a Company director since 2008 as well as from 1993-2006. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of January 28, 2018, Defendant Stevens beneficially owned 1,981,647 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 26, 2018 was $243.33, Stevens owned approximately $482.2 million worth of NVIDIA stock.

65.     For the fiscal year ended January 28, 2018, Defendant Stevens received $359,066 in compensation from the Company. This included $75,000 in fees earned or cash paid, and $284,066 in stock awards.

66.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stevens made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 20, 2017 | 80,250 | $    187.23 | $    15,025,207 |
| June 13, 2018 | 38,040 | $    263.61 | $    10,027,724 |

Thus, in total, before the fraud was exposed, he sold 118,290 Company shares on inside information, for which he received approximately $25.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

67.     The Company's 2018 Proxy Statement stated the following about Defendant Stevens:

Mark A. Stevens has been the managing partner of S-Cubed Capital, a private family office investment firm, since 2012. He was a managing partner from 1993 to 2011 of Sequoia Capital, a venture capital investment firm, where he had been an associate for the preceding four years. Previously, he held technical sales and marketing positions at Intel Corporation, and was a member of the technical staff at Hughes Aircraft Co. Mr. Stevens serves as a member of the board of directors of Quantenna Communications, Inc., a provider of Wi-Fi solutions and is a Trustee of the University of Southern California. Mr. Stevens holds a BSEE degree, a BA degree in Economics and an MS degree in Computer Engineering from the University of Southern California and an MBA degree from Harvard Business School.

*Mr. Stevens brings to the Board a deep understanding of the technology industry, and the drivers of structural change and high-growth opportunities. He provides valuable insight regarding corporate strategy development and the analysis of acquisitions and divestitures. His significant financial community experience gives the Board an understanding of the methods by which companies can increase value for their stockholders.*

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

68.     By reason of their positions as officers, directors, and/or fiduciaries of NVIDIA and because of their ability to control the business and corporate affairs of NVIDIA, the Individual Defendants owed NVIDIA and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NVIDIA in a fair,

just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NVIDIA and its shareholders so as to benefit all shareholders equally.

69.     Each director and officer of the Company owes to NVIDIA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NVIDIA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of NVIDIA were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NVIDIA, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised NVIDIA's Board at all relevant times.

73.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of

material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

74.     To discharge their duties, the officers and directors of NVIDIA were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NVIDIA were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to NVIDIA's own Worldwide Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how NVIDIA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of NVIDIA and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NVIDIA's operations would comply with all applicable laws and NVIDIA's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to NVIDIA and the shareholders the duty of loyalty requiring that each favor NVIDIA's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of NVIDIA and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, and directorial positions with NVIDIA, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NVIDIA.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of NVIDIA, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NVIDIA and was at all times acting within the course and scope of such agency.

## NVIDIA'S CODE OF CONDUCT

84.     The Company's Worldwide Code of Conduct (the "Code of Conduct"), states that: "Every NVIDIA employee and board member is expected to read, understand, and comply with Our Code."

85.     The Code of Conduct provides, under the section titled, "We make ethical decisions," that: "[w]hen we face difficult decisions at NVIDIA, we take the time to consider the implications of our actions regarding the law, Our Code, and other NVIDIA policies."

86.     The Code of Conduct provides that the Company strives for high ethical standards, stating in relevant part, as to "Intellectual Honesty," that:

> We operate at the highest ethical standards. We seek to accurately know ourselves and our capabilities—acknowledging our weaknesses and learning from our mistakes. The sharpest understanding of reality improves our work. Identifying the origins of mistakes is not about blame. It is essential to learning and constant improvement. We say what we believe, and have the courage to act on it.

87.     The Code of Conduct contains a section promising "We Act As One Team To Do What's Best For The Company," claiming that "We market our products and services accurately." That section states:
- We represent our products and services accurately and truthfully.
- We always position and market our products to maintain the value of our innovation.
- We don't create misleading impressions in any advertising, marketing, or sales materials or presentations . . . .

88.     The Code of Conduct provides that the Company meets its disclosure obligations and is "committed to full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, as well as in other public communications or in material that we develop for internal use."

89.     The Code of Conduct also provides that the Company avoids conflicts of interests: "[We] [m]ake decisions in the best interests of NVIDIA. Avoid situations where our actions might create a conflict—actual or potential—between our personal gain and our obligations to NVIDIA. If such conflicts arise, we immediately remove ourselves from any decision-making role in the matter."

90.     The Code of Conduct provides as to trading or disclosing non-public information, that: "[w]e don't trade NVIDIA stock while we are aware of material, non-public information or outside of designated trading periods (unless under a 10b5-1 trading plan)."

## NVIDIA'S SUPPLEMENTAL CODE OF CONDUCT

91.     The Company has also adopted a Supplemental Code of Conduct entitled "The Financial Team Code" (the "Supplemental Code of Conduct"), which applies to, among other individuals, the CEO, CFO, and the Board.

92.     The purpose of the Supplemental Code of Conduct is to "set forth NVIDIA's position in several important areas."

93.     Individuals covered by the Supplemental Code of Conduct have additional specific obligations, which include:

1.  Act honestly, ethically and fairly, avoiding actual or apparent conflicts of interest. If there is even the potential for conflict or ambiguity between what is and is not permitted, the conduct in question must be avoided.

2.  Act in good faith with integrity, and without misrepresenting or failing to disclose material facts known to you with respect to your financial duties to NVIDIA.

3.  Communicate information in a clear manner that ensures full, fair, accurate, timely and understandable disclosure in all reports and documents that NVIDIA files with, or submits to, government agencies and in other public communications or develops for internal use.

4.  Ensure that NVIDIA's approved business processes, financial policies and internal controls related to financial reporting are followed by NVIDIA personnel and NVIDIA-retained consultants, including a duty to report any perceived deficiencies in or suspected violations of the same.

5.  NOT directly or indirectly, make or cause to be made, a materially false or misleading statement regarding business processes, financial policies and internal controls related to financial reporting.

6.  NOT omit material facts or make misleading statements to an accountant in connection with an audit of NVIDIA's financial statements or the preparation or filing of any document to be filed with the SEC or any other similar regulatory entity worldwide; and

7.  If a member of our Financial Team becomes aware of any suspected or known violations of this Financial Team Code, he or she has a duty to promptly report such concerns, anonymously or not, either to his or her manager or local human resource representative or through our Speak Up Webline or Hotline. No person who in good faith reports a violation, or suspected violation, of this Financial Team Code shall be retaliated against. To file a report using the Speak Up lines, go to NVINFO and follow the directions under the "Violations of our Codes" link. All reports will be

reviewed and subject to internal investigation by the Compliance Committee or the Audit Committee.

94.     The Individual Defendants violated the Code of Conduct and the Supplemental Code of Conduct (the "Codes") by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

95.     NVIDIA is a computer technology company based in Santa Clara, California that specializes in the research, design, and development of GPUs and related software. GPUs are computer chips equipped with the ability to conduct rapid mathematical calculations and render graphic images and are largely used in computer gaming. GPUs are also used in connection with "mining" cryptocurrency. Cryptomining is a process that allows the public to generate cryptocurrency or digital tokens through solving complex mathematical equations. The process involves a race between miners to be the first to solve various codes. To compete with each other, cryptocurrency miners rely on computers with specialized hardware; the process often involves high energy and electricity usage. As the efficiency of CPUs (central processing units that were used to mine cryptocurrency) dwindled, GPUs became popular amongst the cryptocurrency mining community for their increased processing speed and overall greater efficiency.

96.     Although NVIDIA's GPUs were marketed primarily to computer gaming customers, increased demand for GPUs for cryptocurrency-related purposes, such as "mining," provided an opportunity for NVIDIA to expand its GPUs to encompass new cryptomining customers. As NVIDIA entered this space, the Company stressed that its business focus remained on other customer bases—specifically on manufacturing GPUs for its gaming customers. As NVIDIA sales increased, the Company attributed GPU sales to the computer gaming community and other factors outside of cryptocurrency-related purposes.

97.     Starting from August 10, 2017, the Company issued multiple statements through SEC filings, press releases, and conferences assuring the investing public that its business focus was not on the cryptocurrency market, and that the small portion that was associated with cryptomining could strategically manage the volatility of the cryptocurrency market.

**False and Misleading Statements**

***August 10, 2017 Form 8-K, Press Release, and Conference Call***

98.     On August 10, 2017, NVIDIA issued a press release which was also attached to its Form 8-K filed with the SEC, announcing its financial results for its second fiscal quarter ended July 30, 2017. The press release stated that NVIDIA experienced a "record revenue . . . of $2.23 billion, up 56 percent from $1.43 billion a year earlier, and up 15 percent from $1.94 billion in the previous quarter." The press release quoted Defendant Huang, who stated the business growth acceleration was due to "Datacenter revenue increas[ing] more than two and a half times[,]" "[a] growing number of car and robot-taxi companies . . . choosing our DRIVE PX self-driving computing platform. And in Gaming, increasingly the world's most popular form of entertainment, we power the fastest growing platforms - GeForce and Nintendo Switch."

99.     The same day, August 10, 2017, the Company held a conference call to discuss NVIDIA's earnings and operations with investors and analysts. Responding to questions on how NVIDIA was managing the volatility in cryptocurrency markets, Defendant Huang asserted, "our strategy is to stay very, very close to the market. We understand its dynamics really well." Defendant Huang maintained that NVIDIA would not be impacted by volatile cryptocurrency markets since "the larger of a GPU company you are, the greater ability you could absorb the volatility." Huang also emphasized NVIDIA's "ability to rock and roll with this market as it goes."

***September 6, 2017 Presentation at the Citi Global Technology Conference***

100.    On September 6, 2017, NVIDIA presented at the Citi Global Technology Conference. At the conference, CFO Kress responded to an inquiry regarding what measures NVIDIA had taken "to avoid cannibalization of core gaming market" from the increased demand of cryptocurrency miners. Kress noted that "we covered most of cryptocurrency with our cryptocards that we had developed." She

additionally asserted NVIDIA's "ability, given the breadth of GPUs that we already build, to develop GPUs exclusively for cryptocurrency" and that NVIDIA was able "to serve that market quite effectively, and we will serve that market effectively."

### *November 9, 2017 Form 8-K, Press Release, and Conference Call*

101.    On November 9, 2017, NVIDIA announced its financial results for its third fiscal quarter ended October 29, 2017 in a press release also attached to the Company's Form 8-K filed with the SEC. The press release stated, "record revenue . . . of $2.64 billion, up 32 percent from $2.00 billion a year earlier, and up 18 percent from $2.23 billion in the previous quarter." CEO Huang, as quoted in the press release, stated NVIDIA's revenue growth was due to a number of factors such as, "Volta GPU [being] embraced by every major internet and cloud service provider and computer maker" NVIDIA's "new TensorRT inference acceleration platform open[ing] us to growth in hyperscale datacenters"; "GeForce and Nintendo Switch are tapped into the strongest growth dynamics of gaming"; and the Company's "new DRIVE PX Pegasus for robotaxis [being] adopted by companies around the world."

102.    NVIDIA also held a conference call the same day to discuss the Company's earnings and operations with investors and analysts. During the call, Kress assured that while "GPU sales . . . benefited from continued cryptocurrency mining" NVIDIA "remain[s] nimble in our approach to the cryptocurrency market." Defendant Kress also stressed to investors that the Company's cryptocurrency-related business would "not distract us from focusing on our core Gaming market." An analyst on the call questioned "why should we think that crypto won't impact the gaming demand in the future?" Huang responded by stating "longer term, the way to think about that is . . . crypto is small for us but not 0." Defendant Huang continued to downplay the importance cryptomining had on NVIDIA's growth, and stated that "when you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world. And our overall GPU business is really sizable and we have multiple segments." Huang additionally stated, "crypto usage of GPUs will be small but not 0 for some time."

*November 29, 2017 Presentation at the Credit Suisse Technology, Media, and Telecom Conference*

103.    On November 29, 2017, NVIDIA presented at the Credit Suisse Technology, Media and Telecom Conference. An analyst from the conference noted "it was the first time that [NVIDIA] had mentioned cryptocurrency as being partly . . . driving the gaming side of the business." NVIDIA acknowledged at the conference that cryptomining did make up some portion of the sales it previously attributed to gaming GPUs. Defendant Kress still further downplayed the impact cryptocurrency had on the Company's gaming sales, stating that "there probably is some residual amount or some small amount in terms of that . . . [w]e do believe the majority does reside in terms of our overall crypto card."

104.    The Company's GPU sales continued to increase even as cryptocurrency prices began to decline in early 2018. NVIDIA attributed this to the "pent up demand" of gaming consumers for affordable GPUs after the rise of GPU prices from the increased cryptomining demand. The results were inventory constraints. Meanwhile, NVIDIA continued to reassure investors that cryptomining was merely a small portion of its business and that the declining cryptocurrency market would not negatively impact the Company.

*February 8, 2018 Form 8-K, Press Release, and Conference Call*

105.    On February 8, 2018, NVIDIA announced its financial results for its fourth quarter and full year ended January 28, 2018 in a press release also attached the Company's Form 8-K filed with the SEC. The press release stated, "record revenue . . . of $2.91 billion, up 34 percent from $2.17 billion a year earlier, and up 10 percent from $2.64 billion in the previous quarter." As quoted in the press release, Defendant Huang attributed the revenue growth to "software developers working in AI, self-driving cars, and a broad range of other fields [that] continued to discover the acceleration and money-saving benefits of our GPU computing platform."

106.    The same day, NVIDIA held a conference call to discuss the Company's earnings and operations with investors and analysts. During the call, Defendant Kress stated that the Company "met some of this [cryptocurrency] demand with a dedicated board in our OEM business and some was met with our gaming GPUs. This contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter." Although Defendant Kress acknowledged that the "overall contribution

of cryptocurrency to our business . . . was a higher percentage of revenue than the prior quarter," she stressed that the Company's "main focus remains on our core gaming market." During the call, Defendant Huang told investors "there is a fairly sizable pent up demand going into this quarter" for NVIDIA's GPUs. Defendant Huang further stated that the GPU supply "channel is relatively lean," and the Company was "working really hard to get GPUs down to the marketplace for the gamers."

### February 26, 2018 Presentation at the Morgan Stanley Technology, Media

107.    On February 26, 2018, NVIDIA presented at the Morgan Stanley Technology, Media & Telecom Conference. During the conference, an analyst questioned why NVIDIA's GPU supplies were constrained and how NVIDIA was prioritizing sales to meet the constraint. In response, Defendant Kress stated that the "channels had been influenced by not only the strength of the overall gaming that we had seen for the overall holiday season, but also the large uptick that we've seen in the overall valuation of cryptocurrency." Kress additionally stated that the Company's focus was on "mak[ing] sure [] gamers worldwide receive the cards that we want to do." Kress further reassured investors, stating that, "we do believe we can serve [cryptocurrency miners] primarily with those specialized cards and that's going to be our goal going forward" and "we're going to really try our hardest to really focus our overall GPUs for gaming for overall gamers going forward."

### February 28, 2018 10-K

108.    On February 28, 2018, the Company filed with the SEC its annual report for the fiscal year ended January 28, 2018 on a Form 10-K (the "2018 10-K"), which was signed by the Individual Defendants.

109.    The 2018 10-K, regarding factors that could affect their future results and operations, included "fluctuations in the demand for our products related to cryptocurrencies."

110.    The 2018 10-K additionally stated the following with regard to its revenue growth:

**GPU Business.** GPU business revenue increased by 40% in fiscal year 2018 compared to fiscal year 2017 led by growth in gaming, datacenter and professional visualization. Revenue from sales of GeForce GPU products for gaming increased over 20%, reflecting continued strong demand for our Pascal-based GPU products. Datacenter revenue, including Tesla, GRID and DGX, increased 133%, reflecting strong demand from hyperscale and cloud customers for deep learning training and accelerated GPU computing as well as demand for HPC, DGX AI supercomputing and GRID

virtualization platforms. Revenue from Quadro GPUs for professional visualization increased by 12% due primarily to higher sales in both high end desktop and mobile workstation products. Revenue from GeForce GPU products for mainstream PC OEMs increased by over 90% due primarily to strong demand for GPU products targeted for cryptocurrency mining.

111.    Attached to the 2018 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Huang and Kress, attesting to the accuracy of the 2018 10-K.

***April 6, 2018 Proxy Statement***

112.    The Company filed its 2018 Proxy Statement with the SEC on April 6, 2018. Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

113.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

We expect our directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty. Our credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee. We have a Code of Conduct that applies to our executive officers, directors and employees, including our principal executive officer, principal financial officer and principal accounting officer. We also have a Financial Team Code of Conduct that applies to our executive officers, directors and members of our finance department. We regularly review our Code of Conduct and related policies to ensure that they provide clear guidance to our directors, executives and employees.

114.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by ten of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

115.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

performance" elements, including equity awards designed to align "[Named Executive Officers'] interests with those of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

116.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls.  Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### May 10, 2018 Form 8-K, Press Release, and Conference Call

117.    On May 10, 2018, NVIDIA announced its financial results for the first quarter ended April 29, 2018 in a press release also attached to the Company's Form 8-K filed with the SEC. The press release stated, "record revenue . . . of $3.21 billion, up 66 percent from $1.94 billion a year earlier, and up 10 percent from $2.91 billion in the previous quarter." As quoted in the press release, Defendant Huang, attributed the revenue growth to the Company's "datacenter business [that] achieved another record and [that] gaming remained strong."

118.    The same day, NVIDIA held a conference call to discuss the Company's earnings and operations with investors and analysts. During the call, Defendant Huang again maintained to investors that NVIDIA's gaming GPU sales were not driven by cryptocurrency miners. Specifically, Defendant Huang stated "we try to as transparently review our numbers as best we can. Our strategy is to create a SKU that allows the crypto miners to fulfill their needs . . . . And to . . . as much as possible, fulfill their demand that way."

*May 16, 2018 Annual Shareholder Meeting*

119.    On May 16, 2018, NVIDIA held its annual shareholder meeting. During the meeting, Defendant Huang continued to downplay the impact of cryptocurrency mining importance on NVIDIA's growth stating, "Ethereum and crypto mining is a recent GPU application. It is a bonus in our business, but volatile. It's not really a factor in our core business. We have great growth drivers without crypto." Defendant Huang outlined to investors that "our core businesses in gaming and high-performance computing and artificial intelligence and in self driving cars are doing so well that with or without crypto mining, we have a growth – we have a wonderful growth business behind us."

120.    The statements in ¶¶ 99-112 and 118-120 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge While False and Misleading Statements Continue

121.    On August 16, 2018, NVIDIA filed a current report on Form 8-K with the SEC lowering its revenue guidance around 2.2% for the third fiscal quarter. In addition, the Company revealed low expectations for any significant growth arising from cryptocurrency miners through the end of the year. NVIDIA also reported that its inventory of GPUs had ballooned more than 30% from the quarter before. As analysts and investors absorbed the disclosures, NVIDIA shares declined by $12.62 per share, or 4.9%. Despite the disclosures, the Company did not appropriately address the public's concerns over the decrease in GPU sales.

122.     Indeed, the same day, the Company held a conference call with analysts and investors. During the call, Defendant Huang blamed the ballooning inventories on the launch of NVIDIA's new GPU product, which featured NVIDIA's "Turing Architecture." Defendant Huang assured investors that the overstocked inventory would "work itself out." Huang also asserted that NVIDIA was "not concerned about the channel inventory" and that those at NVIDIA "are masters at managing our channel, and we understand the channel very well."

123.     The statements in ¶¶ 122-123 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company had not mastered its inventory channel; (2) the Company was unable to adapt to the volatility of the cryptocurrency market; (3) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (4) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel, and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

124.     On November 15, 2018, NVIDIA revealed in a press release also attached to a Form 8-K filed with the SEC that the Company's revenue would decline over 7% for the fourth fiscal quarter ending January 27, 2019. The significant cut in the Company's revenue guidance was in stark contrast to the growth investors were led to expect. The Company blamed its poor financial results on the decreased demand from cryptocurrency-related customers which led to an oversupplied inventory of midrange GPUs. According to Defendants Huang and Kress, the inventory of GPUs in the channel had built up before the rapid decline of cryptomining. For example, in the press release, Defendant Huang stated "[o]ur near-term results reflect excess channel inventory post the crypto-currency boom, which will be corrected." Defendant Kress additionally commented, "[o]ur gaming revenue outlook for the fourth quarter of fiscal 2019 is impacted by the expected work-down of Pascal mid-range gaming card inventory in the channel . . . ."

125.     Consequently, NVIDIA stated it would halt shipments of any mid-range GPUs into the channel for at least a full quarter. The disclosures directly contradicted the Company's prior statements and assurances that it would not be negatively impacted by the volatility of the cryptocurrency markets. Although NVIDIA claimed it would need an entire 3 months to correct the overstocked inventory channel, analysts questioned the Company's ability to do so, noting it could even take three whole quarters to resolve.

**Repurchases During the Relevant Period**

126.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.1 billion to repurchase 4.8 million shares of its own common stock at artificially inflated prices from August 28, 2017 through October 28, 2018.

127.     As the Company stock was actually only worth $144.70 per share, the price at closing on November 19, 2018, the Company overpaid approximately $404.3 million in total for these repurchases.

128.     According to the Company's Form 10-Q filed with the SEC on November 21, 2017, between August 28, 2017 and September 24, 2017, the Individual Defendants caused the Company to repurchase 1 million shares of its own common stock at an average price per share of approximately $180.56, for a total cost to the Company of approximately $180.6 million.

129.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $35.86 more than the actual worth of each share between August 28, 2017 and September 24, 2017. Thus, the total over payment by the Company for repurchases of its own stock between August 28, 2017 and September 24, 2017 was over $35.8 million.

130.     According to the Company's Form 10-Q filed with the SEC on May 22, 2018, between January 29, 2018 and February 25, 2018, the Individual Defendants caused the Company to repurchase 2 million shares of its own common stock at an average price per share of approximately $238.63, for a total cost to the Company of approximately $477.3 million.

131.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $93.93 more than the actual worth of each share between January 29, 2018 and February 25, 2018. Thus, the total over payment by the Company for repurchases of its own stock between January 29, 2018 and February 25, 2018 was over $187.8 million.

132.     According to the Company's Form 10-Q filed with the SEC on May 22, 2018, between February 26, 2018 and March 25, 2018, the Individual Defendants caused the Company to repurchase 1 million shares of its own common stock at an average price per share of approximately $236.25, for a total cost to the Company of approximately $236.3 million.

133.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $91.55 more than the actual worth of each share between February 26, 2018 and March 25, 2018. Thus, the total over payment by the Company for repurchases of its own stock between February 26, 2018 and March 25, 2018 was over $91.5 million.

134.     According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between the months of July 30, 2018 and August 26, 2018, the Individual Defendants caused the Company to repurchase 116,000 shares of its own common stock at an average price per share of approximately $240.87, for a total cost to the Company of approximately $27.9 million.

135.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $96.17 more than the actual worth of each share between July 30, 2018 and August 26, 2018. Thus, the total over payment by the Company for repurchases of its own stock between July 30, 2018 and August 26, 2018 was over $11.1 million.

136.     According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between the months of August 27, 2018 and September 23, 2018, the Individual Defendants caused the Company to repurchase 567,000 shares of its own common stock at an average price per share of approximately $266.07, for a total cost to the Company of approximately $150.9 million.

137.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $121.37 more than the actual worth of each share between August 27, 2018 and September 23, 2018. Thus, the total over payment by the Company for repurchases of its own stock between August 27, 2018 and September 23, 2018 was over $68.8 million.

138.     According to the Company's Form 10-Q filed with the SEC on November 15, 2018, between the months of September 24, 2018 and October 28, 2018, the Individual Defendants caused the Company to repurchase 82,000 shares of its own common stock at an average price per share of approximately $255.41, for a total cost to the Company of approximately $20.9 million.

139.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $110.71 more than the actual worth of each share between September 24, 2018 and October 28, 2018. Thus, the total over payment by the Company for repurchases of its own stock between September 24, 2018 and October 28, 2018 was over $9.1 million.

140.     In total, the Company overpaid an aggregate amount of approximately $404.3 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO NVIDIA

141.     As a direct and proximate result of the Individual Defendants' conduct, NVIDIA has lost and expended, and will lose and expend, many millions of dollars.

142.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its President and CEO, and its Vice President and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.     Such losses include, but are not limited to, approximately $404 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

144. Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

145. As a direct and proximate result of the Individual Defendants' conduct, NVIDIA has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

146. Plaintiff brings this action derivatively and for the benefit of NVIDIA to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of NVIDIA, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

147. NVIDIA is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148. Plaintiff is, and has continuously been at all relevant times, a shareholder of NVIDIA. Plaintiff will adequately and fairly represent the interests of NVIDIA in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

149. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

150. A pre-suit demand on the Board of NVIDIA is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven Individual Defendants: Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was commenced.

151.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while nine of them engaged in insider sales based on material non-public information, netting proceeds of over $139.6 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

152.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153.    Additional reasons that demand on Defendant Huang is futile follow. Defendant Huang is the co-founder of the Company and has served as the Company's President and CEO since its inception. He also serves as a member of the Board.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Huang with his principal occupation, and he receives handsome compensation, including $12,993,532 during the fiscal year ended January 28, 2018. Defendant Huang was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, most of which he personally made statements in, and the 2018 10-K, which he signed and signed a SOX certification for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale before the fraud was exposed, which yielded at least $18.2 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, Defendant Huang is a defendant in the Securities

Class Actions. For these reasons, too, Defendant Huang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Burgess is futile follow. Defendant Burgess has served as a Company director since 2011 and serves as Chair of the Compensation Committee. Defendant Burgess receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Burgess signed, and thus personally made the false and misleading statements in, the 2018 10-K. For these reasons, too, Defendant Burgess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Coxe is futile follow. Defendant Coxe has served as a Company director since 1993 and serves on the Compensation Committee.  Defendant Coxe receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Coxe signed, and thus personally made the false and misleading statements in, the 2018 10-K. For these reasons, too, Defendant Coxe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Drell is futile follow. Defendant Drell has served as a Company director since 2015 and serves on the Compensation Committee.  Defendant Drell receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme

to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Drell signed, and thus personally made the false and misleading statements, in the 2018 10-K. Her insider sales before the fraud was exposed, which yielded at least $1.3 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Drell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

157.   Additional reasons that demand on Defendant Gaither is futile follow. Defendant Gaither has served as a Company director since 1998 and serves on the Nominating and Corporate Governance Committee. Defendant Gaither receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gaither signed, and thus personally made the false and misleading statements, in the 2018 10-K. His insider sale before the fraud was exposed, which yielded at least $21.3 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Gaither breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.   Additional reasons that demand on Defendant Hudson is futile follow. Defendant Hudson has served as a Company director since 2013 and serves as a member of the Audit Committee. Defendant Hudson receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Hudson signed, and thus personally made the false and misleading statements, in the 2018 10-K.  Her insider sales before the fraud was exposed, which yielded

at least $3.9 million in proceeds, demonstrates her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Hudson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since 1993 and serves as a member of the Compensation Committee and Chair of the Nominating and Corporate Governance Committee. Defendant Jones receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Jones signed, and thus personally made the false and misleading statements in, the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $42.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Jones breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant McCaffery is futile follow. Defendant McCaffery has served as a Company director since 2015 and serves as Chair of the Audit Committee. Defendant McCaffery receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant McCaffery signed, and thus personally made the false and misleading statements in, the 2018 10-K. For these reasons, too, Defendant McCaffery breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Perry is futile follow. Defendant Perry has served as a Company director since 2005 and serves as a member of the Audit Committee and the

Nominating and Corporate Governance Committee. Defendant Perry receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Perry signed, and thus personally made the false and misleading statements in, the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $6.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  For these reasons, too, Defendant Perry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Seawell is futile follow. Defendant Seawell has served as a Company director since 1997 and serves as a member of the Compensation Committee. Defendant Seawell receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Seawell signed, and thus personally made the false and misleading statements in, the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $10.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Seawell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Stevens is futile follow. Defendant Stevens has served as a Company director since 2008, and previously served as director from 1993-2006. Defendant Stevens sits on the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Stevens receives handsome compensation, including $359,066 during the fiscal year ended January 28, 2018. As a long-time Company director he conducted little, if any, oversight of

the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Stevens signed, and thus personally made the false and misleading statements in, the 2018 10-K. His insider sales before the fraud was exposed, which yielded at least $25.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Stevens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    As described above, nine of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Huang, Coxe, Drell, Gaither, Hudson, Jones, Perry, Seawell, and Stevens collectively received proceeds of over $139.6 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

166.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Gaither and Coxe both serve as long-term Managing Directors at Sutter Hill Ventures. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

167.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust

enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

168.    NVIDIA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for NVIDIA any part of the damages NVIDIA suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

169.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

170.    The acts complained of herein constitute violations of fiduciary duties owed by NVIDIA officers and directors, and these acts are incapable of ratification.

171.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of NVIDIA. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of NVIDIA, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is

brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

172.    If there is no directors' and officers' liability insurance, then the Directors will not cause NVIDIA to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

173.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of

### Section 14(a) of the Exchange Act

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

176.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

177.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under

which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

178.   Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose, *inter alia*, that: (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls.

179.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to align "[Named Executive Officers'] interests with those of our stockholders" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

180.   The 2018 Proxy Statement also made references to the Codes. The Codes required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Codes. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the Codes' terms were being violated.

181.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were

material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

182. The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Huang, Burgess, Coxe, Drell, Gaither, Hudson, Jones, McCaffery, Perry, Seawell, and Stevens, which allowed them to continue breaching their fiduciary duties to NVIDIA.

183. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

184. Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding NVIDIA. Not only is NVIDIA now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon NVIDIA by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over a billion dollars of its own shares on the open market at artificially-inflated prices, damaging NVIDIA.

187. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

188. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of

conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NVIDIA not misleading.

189.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by NVIDIA. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

190.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-K filed with the SEC during the Relevant Period.

191.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

192.    Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Exchange Act

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.    The Individual Defendants, by virtue of their positions with NVIDIA and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of NVIDIA and each of its

officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause NVIDIA to engage in the illegal conduct and practices complained of herein.

195.    Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NVIDIA's business and affairs.

198.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

199.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NVIDIA.

200.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

201.    In further breach of their fiduciary duties owed to NVIDIA, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: : (1) NVIDIA's GPU sales growth was significantly affected by the demand for GPUs for use in cryptocurrency related activities; (2) the Company had not mastered its inventory channel; (3) the Company was unable to adapt to the volatility of the cryptocurrency market; (4) while the price of cryptocurrencies fell, the Company continued to inject mid-range GPUs into the inventory channel, disguising stagnating cryptomining-related growth; (5) the increased supply of midrange GPUs to the inventory channel would foreseeably lead to 3 months of oversupply in the channel; and (6) the Company failed to maintain internal controls.  As a result of

the foregoing, the Company's public statements were materially false and misleading at all relevant times.

202. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

203. In breach of their fiduciary duties, ten of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $1.1 billion worth of Company stock at artificially inflated prices.

204. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

205. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

206.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NVIDIA has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.    Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NVIDIA.

211.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from NVIDIA that was tied to the performance or artificially inflated valuation of NVIDIA, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

212.    Plaintiff, as a shareholder and a representative of NVIDIA, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.    Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

214. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

216. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

217. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

218. Plaintiff on behalf of NVIDIA has no adequate remedy at law.

## PRAYER FOR RELIEF

219. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of NVIDIA, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to NVIDIA;

(c) Determining and awarding to NVIDIA the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing NVIDIA and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NVIDIA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for

amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of NVIDIA to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding NVIDIA restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: January 18, 2019                     Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            /s/Laurence M. Rosen
                                            Laurence M. Rosen, Esq. (SBN 219683)
                                            355 S. Grand Avenue, Suite 2450
                                            Los Angeles, CA 90071
                                            Telephone: (213) 785-2610
                                            Facsimile: (213) 226-4684
                                            Email: lrosen@rosenlegal.com

                                            *Liaison Counsel for Plaintiff*

                                            **THE BROWN LAW FIRM, P.C.**
                                            Timothy Brown
                                            240 Townsend Square
                                            Oyster Bay, NY 11771
                                            Telephone: (516) 922-5427

Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Sanghyep Han  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of January 2019.

1/17/2019

DocuSigned by:

_Sanghyep Han_

6A929B78C549452...

Sanghyep Han